[Civil No. 1452.   Filed June 28, 1915.]

[149 Pac. 763.]

## PEOPLE'S NATIONAL BANK, a Corporation, Appellant, v. GEORGE TAYLOR, Appellee.

1. BILLS AND NOTES—"NEGOTIABLE INSTRUMENT"—WHAT IS.—A note payable to the maker's own order in a specified sum, with interest and reasonable attorney's fee, and indorsed by the maker in blank, is a negotiable instrument.

   [As to what is a negotiable note, see note in **Ann. Cas. 1912D, 4.**]

2. CORPORATIONS — STOCK SUBSCRIPTION CONTRACTS — FRAUD.— A contract to subscribe for the stock of a corporation, induced by fraudulent representations of the value of the assets of the corporation and relied on by the subscriber, executing a note for the price, may be rescinded and the note repudiated because of failure of consideration.

3. CORPORATIONS—STOCK SUBSCRIPTION CONTRACTS—FRAUD.—Evidence *held* to justify a finding that one was induced, by fraudulent representations of the value of the assets of a corporation, to subscribe for stock and give a note for the price.

4. BILLS AND NOTES—HOLDER IN DUE COURSE—EVIDENCE.—Evidence *held* not to show that the holder of a note or some person under whom he claimed acquired title in due course, as required by negotiable instrument law (Civ. Code 1913, par. 4204), to authorize a recovery against the maker, pleading and proving failure of consideration and fraud inducing the execution of the note.

5. BILLS AND NOTES—"PAYABLE TO BEARER."—A note payable to the maker and indorsed by him in blank, which indorsement is the last one, is payable to bearer, within negotiable instrument law (Civ. Code 1913, par. 4154, subd. 5), declaring that an instrument is payable to bearer when the only or last indorsement is an indorsement in blank.

6. CORPORATIONS—STOCK SUBSCRIPTION CONTRACTS—PERFORMANCE.—A contract to subscribe for stock of a corporation is not performed by the issuance of stock of a subsequent corporation, acquiring the assets of the former corporation.

APPEAL from a judgment of the Superior Court of the County of Maricopa.   J. C. Phillips, Judge.   Affirmed.

Messrs. Chalmers & Kent, for Appellant.

Messrs. Armstrong & Lewis and Mr. R. L. Morgan, for Appellee.

CUNNINGHAM, J.—The appellant commenced this action, as holder of a note made by the appellee payable to his own order, in the sum of $2,000, with interest, and a reasonable attorney's fee, and indorsed by the appellee in blank. The note bears the indorsement in blank of the Western Underwriting Company, by H. J. Adams, secretary. The plaintiff alleges that it came lawfully to the possession of the note for value, before maturity, alleging that the sum of $140 has been paid on account of interest, and demands judgment for the principal sum and for interest and $200 as a reasonable attorney's fee for collecting the same.

The answer sets forth a state of facts which, if established, entitled the defendant to interpose the defense of absence or failure of consideration and pleaded that defense. The answer will be noticed more in detail later in this opinion. A trial was had to the court without a jury, which resulted in the making and filing by the court of special findings of fact and conclusions of law, with an order for judgment in favor of the defendant, and judgment was entered accordingly.

The plaintiff appeals from the judgment and from an order refusing a new trial, and as grounds for reversal it assigns error in 24 separate paragraphs. These are grouped by appellant into three divisions, or groups, and presented in that order. The first division "relates to the question of alleged fraud, misrepresentation, and want of consideration"; the second "relates to the question of the reliance of the defendant Taylor on the alleged fraud and misrepresentation"; and the third "relates to the question of notice on the part of the plaintiff of the alleged infirmities and defects of title in the note sued on."

The decisive question is the sufficiency of the evidence to sustain the findings of fact and the judgment. All other questions become subordinate questions.

The note set forth in the complaint is a negotiable instrument, and as such it has all the protection of the law given to such instruments, and is therefore free from the defense of

failure of consideration pleaded, unless the defendant first shows by pleading and thereafter from a preponderance of the evidence, to the satisfaction of the court, that the title of some holder who has negotiated the instrument was defective, then the burden is on the plaintiff to prove that it, or some person under whom it claims, acquired the title as a holder in due course. Paragraph 4204, Civil Code of Arizona of 1913 (Negotiable Instrument Law).

In its answer the defendant admits the making of the note set forth in the complaint, and admits that he indorsed the note in blank as alleged, and avers that he delivered it so indorsed to O. O. Garrett, as the agent of the Western Underwriting Company, in consideration of the agreement of said company to issue and deliver to defendant 1,000 shares of its capital stock, and not otherwise; and said note was procured to be made and delivered by the false and fraudulent representations of the said company.

The representations so inducing the making and the delivery of the note are alleged to have been the following:

"That said corporation was a solvent, prosperous, going concern and had assets consisting of the stocks of other corporations, bonds, and mortgages, of the actual value of more than $300,000, and had no debts or liabilities, and had earned and was then earning, in the legitimate carrying on of its business, more than 20 per cent per annum upon its capital stock and upon the capital stock then offered to this defendant as a consideration for the making of said note," alleging that all of the said statements and representations so made were then and there false and untrue, and were known to said corporation to be false and untrue, and they were made for the purpose of inducing this defendant to purchase said stock and to make, execute and deliver his said note in payment therefor. That this defendant believed the said representations to be true, and was deceived thereby, and, in ignorance of the fraud and falsity thereof, did execute and deliver to the said corporation his said note as aforesaid, and upon no other or further consideration then or at any time to him paid or by him received.

The defendant then further sets forth that the Western Underwriting Company "concealed from this defendant the fact that said sale of its capital stock was not for the use and

benefit of said corporation and to become part and portion of its capital stock," but defendant, on information and belief, charges the fact to be that the sale was being made "for the sole use and benefit of one J. K. Tennant, who was then acting as the vice-president and manager of said corporation and the promoter thereof. . . . " All of which plaintiff was informed and knew when it took the note from the Western Underwriting Company.

The answer in brief sets forth the circumstances under which the note was made and delivered. These circumstances fairly show: That the defendant agreed to subscribe for 1,000 shares of the capital stock of the Western Underwriting Company, and pay therefor $2,000. That this contract was brought about by Garrett, as the agent and representative of the Western Underwriting Company, for and in behalf of that company, and through false and fraudulent representations. That the contract so entered into is a contract of subscription for stock of the Underwriting Company; it agreeing to sell defendant 1,000 shares of its capital stock in consideration that defendant pay therefor $2,000, payable in one year, as evidenced by the note in suit. That, pursuant to said agreement defendant, believing the false and fraudulent representations to be true, and in ignorance of the said fact concealed, made, executed and delivered the said note in performance of said agreement, and the underwriting company has failed to issue and deliver the said shares of stock and thus perform its part of the contract, and on account, and for the reason said contract, in pursuance to the terms of which the note was made and delivered, was void for the fraud practiced, the defendant rescinds and repudiates the same and repudiates his obligation and promise evidenced by the said note, the consideration for the note is absent or has failed, and the title in the Underwriting Company's hands was defective.

The contract, pursuant to the terms of which the note was made, having been induced by fraud, was void, and the promise of the Western Underwriting Company to issue and deliver the stock, not having been performed as agreed, could be repudiated and rescinded by the defendant, and his promise to pay for the stock withdrawn, because the note was given for no consideration.

The Western Underwriting Company's promise to deliver stock was a promise to deliver the stock of a corporation such as represented, and such representations, being false and untrue, did not constitute such promise as defendant relied upon as a consideration for his promise evidenced by the note to pay $2,000. The stock the underwriting company actually agreed to issue and deliver for the $2,000 was stock of a very different nature from its stock representing assets of little or no value. Such stock defendant did not agree to buy and pay $2,000 for as the purchase price. The promise made hence proved to be no promise; therefore he received no consideration for his note. The Western Underwriting Company's title to the note, having been acquired through its fraud and deceit, was defective and void, in its possession, and unenforceable. Such fact having been shown by the defendant in his answer, the burden was upon him to prove, by substantial evidence, the allegations of his answer setting up fraud in the agreement substantially as alleged.

In support of such allegations, the defendant offered himself as a witness, and testified, in substance:

That he agreed to buy 1,000 shares of Western Underwriting Company's stock upon Mr. Garrett's representations, and did buy said stock giving the note in suit in payment therefor. That Garrett "told me that they had a very little amount of this stock to sell. That the stock had a book value of $5 per share, and that the stock was paying dividends of 20 per cent per annum. I believed what he told me and the way he represented the stock and agreed to take 1,000 shares. . . . Mr. Garrett said that the assets of the company were about half a million; I don't remember the exact amount. That the company was in good condition and was actually paying 5 per cent dividends quarterly and continuous. . . . Mr. Garrett told me the stock had a book value of $5 per share, which I understood to mean that the stock was actually worth $5 per share. Book value I understand to be by their own books—the books of the company. He said the stock was paying 20 per cent dividends and would continue, and that the assets of the company was something over a half million dollars, and that the company was in good condition."

Witness Mullen, a witness for defendant, brought Taylor and Garrett together at the time the transaction was had, and he testifies:

That Garrett "told Taylor about the affairs of the company—what the company was doing. He said the company was in excellent circumstances. I think he used a paper showing the assets of the company to be over a half million dollars; that the stock had been taken off the market; and, in order to advertise the mortgage department of the company, they had voted to sell another 100,000 shares . . . at $2 per share. He said Taylor and I ought each to take 1,000 shares; that it was actually worth $5 a share, and would soon be taken off the market.''

Garrett denied making such representations, and testified to the representations he claimed to have made at the time. On such conflicting evidence upon that question, the court finds as a fact that Garrett "represented and stated to the defendant, Taylor, that said corporation was solvent, prosperous, a going concern, and had assets in excess of $500,000, and was paying, in the carrying on of its business, 20 per cent per annum upon its capital stock"; that the stock then had a "book value of $5 per share; and that the purchase of its stock was a splendid investment, and that one could not lose by purchasing it." Thus the representations claimed as untrue were established as actually having been made by Garrett.

Mr. Edmonds, cashier of plaintiff bank, was called by the defendant as a hostile witness, and as evidence of the assets of the corporation testified that he was one of the organizers of the California National Life Insurance Company; that he had full knowledge of the contract between the Life Insurance Company and Tennant, and the Western Underwriting Company, Tennant's assignee of the said contract. The witness was asked the question, viz.:

"So you had full knowledge of the fact that practically the whole assets of the Underwriting Company was the Tennant contract with the California National Life Insurance Company? Ans. I have already stated that."

''The value of the stock was based on the earning capacity of that contract.''

"I knew at the time I took this note of Taylor's all these facts. I knew that this stock was being sold to the public and notes were being taken for the sale of the stock. In this case I knew that the price they were selling the stock for was double par. The par value of the stock of the Underwriting

Company was $1 a share. The total amount of authorized stock was $500,000.''

The amount for which the stock was authorized to be sold was ''under the control of a board, and the board authorized the sale of 100,000 shares over and above what was given Mr. Tennant for his contract.'' He was given ''100,000 shares for his contract and 100,000 for his services, and the fact that he entered into the contract with them to remain as the selling agent to sell the life insurance for them for the term of ten years.'' Witness knew all these things at the time he took the Taylor note, and he ''knew what the earning capacity under that contract was at that time; they had demonstrated it.'' From the evidence it appears that Tennant organized the California National Life Insurance Company authorized to write life insurance. Tennant was its promoter. He took a contract from the life insurance company, by which he was given the exclusive right to act as its agent for several states for a period of years. That such contract was chiefly valuable as an asset of Tennant's personal ability, and, according to Mr. Edmonds, the Western Underwriting Company was a capitalization of that ability. When Tennant assigned his rights in such a contract to another, the Western Underwriting Company, his personality which constituted the chief value, not being transferable, deprived the contract of its chief value. If Tennant's abilities as the managing salesman of life insurance was of any value to the business of the Western Underwriting Company, after it assumed the performance of his contract with the California National Life Insurance Company, such abilities remained valuable, not because Tennant had once agreed to exert such abilities in consideration of the sole right to sell such insurance for a number of years, because, when he transferred such contract to the Western Underwriting Company, it, not Tennant, thereafter assumed to exert its resources to accomplish the purpose of the contract. If it received any benefits from Tennant's abilities (if his abilities became thereafter valuable assets), they became such by reason of his contract agreement or understanding; the contract existing between the Western Underwriting Company and Tennant, by which he agreed to serve it ten years. Whatever value such contract had as a right to solicit and make contracts of insurance, such value would depend

wholly upon the profits of the business actually accruing therefrom. The value of such an asset is wholly speculative and indeterminable by any recognized rule of law. The evidence fairly discloses some returns from sales of life insurance, and from sales of stock to Tennant. There is some evidence tending to show, and fairly showing, that the Western Underwriting Company earned $78,000 profit, presumably from Tennant's energies. Assuming that such profit was earned at the time the transaction was made with Taylor, and the corporation then had such sum in its possession, and earned sufficient profits to pay the quarterly dividends for the first year and half of its existence, and pay its incidental business expenses giving the corporation the benefit of all doubt, but no witness has testified to such facts, then its assets consisted of the contract with the California National Life Insurance Company of no determinable value, its contracts with Tennant of no more value, and the profits earned the first seven or eight months of the company's existence, viz., $78,000. This falls very far short of $300,000 to $500,000. There appears to have been no mortgages, no stock of other corporations, nor money or bonds when the representations were made. No pretense of such assets appear from the evidence. Such a representation, if made, is an inducement to the prospective purchaser of such stock, and is untrue, but its falsity is unknown to the prospective purchaser, and, relying on the statement as true, he enters into the agreement on the faith of such representation, he is deceived and wronged, and the law recognizes his right to rescind the contract made by him on the faith of such false representations.

The other representations made of dividends actually paid may or may not have been true, of which we need not here inquire, as the finding of the court that the representations made inducing the defendant to enter into the contract were false and untrue is supported by substantial evidence. The effect of the existence of such fact is to entitle the defendant to rescind the contract made, and recover that which he has lost by reason of such deceit. In this case he gave his negotiable promissory note to the Western Underwriting Company, by which he promised to pay the bearer $2,000 12 months after date. The promise was void on account of the fraud practiced to obtain it. The title of the Western Underwriting

Company to the note, while it possessed such note, was defective in that the note was void for fraud.   Under paragraph 4204 of the Civil Code of Arizona of 1913 (Negotiable Instrument Law), the defendant having shown that the title of the Western Underwriting Company was so defective, the burden was shifted to the plaintiff, as the holder under the Western Underwriting Company, to prove that it, or some person under whom it claims, acquired the title as a holder in due course.

Assuming such burden, the plaintiff introduced evidence showing that it acquired the note from O. O. Garrett on the seventeenth day of June, 1912, and paid Garrett therefor $2,000, less a discount.   That Garrett offered to sell to it the note on the sixth, seventh, or eighth day of June, 1912.   The note bears date of June 3, 1912.

Edmonds, for plaintiff, testified that he knew that Garrett was employed by the Western Underwriting Company in June, 1912, to sell insurance and stock.   He said:

"I am perfectly willing to state that the Western Underwriting Company was using our bank with permission.   After this stock was sold to Taylor in June, 1912, I allowed the Western Underwriting Company to use our bank as a reference.   I was fairly familiar with the affairs of the Western Underwriting Company at that time.  .I got this Taylor note in the bank June 17, 1912.   I received the note from Mr. Garrett, the man who sold the stock.   I paid Garrett $2,000 for the note, giving all the money to Mr. Garrett.   Garrett claimed to own the note.   His indorsement doesn't appear on the note. . . . I cannot state whether the indorsement of the Western Underwriting Company was on the note at the time we took it in the bank or whether he put it on afterward."

On examination on behalf of the plaintiff he said:

"Mr. Garrett came to me about the 6th or 7th day of June, 1912, and said that he had two notes which he had taken for the sale of stock in the Western Underwriting Company from two men who were residents of Arizona, engaged in business in that state.   He said he desired to sell these notes and wanted to know if our bank would purchase them.   I told him the bank would not purchase them for two reasons: In the first place, we had no knowledge of either one of the makers, and the fact that they were residents of Arizona, and engaged in business in that state, their paper would not be

proper paper for us to take, and for the reason that they were too far out of our district. . . . Then he told me both Mullen and Taylor were coming down to a meeting of the Western Underwriting Company to be held the following week and wanted to know if I would meet them and investigate their financial standing at that time, and, if I found out satisfactory, if I would purchase the paper. I told him I would. . . . I purchased the Taylor note. It was indorsed by him. I am not sure whether there was any indorsement except the indorsement of the maker. . . . ''

Later in his testimony he said:

''Beside the indorsement of the maker, the note was indorsed by the Western Underwriting Company. I found this out at the time the note was indorsed, and I thought it over. . . . I know just how it was indorsed and just when it was indorsed now. When Garrett presented the note to our bank after I told him in my conversation with Mr. Mullen I would take the paper, the paper was not indorsed, and I told him the company should indorse the note, because I had a talk with the manager of the company, Mr. Tennant. I told Mr. Tennant that I had a talk with Mr. Mullen in regard to this paper, and that I was satisfied it was such paper as we would take. I told him that because it was in the ordinary conversation with him. . . . You understand the Western Underwriting Company must have received some of the proceeds of the paper from their agent. I knew the company would necessarily have the prior claim to any proceeds from the notes for the sale of stock their agent made. I knew the agent would have to settle with the company for the stock he sold.''

Mr. Garrett testified about the sale of the note to the bank when the sale was about to be closed, after Edmonds had agreed to take the note. Witness said:

''So he made out the papers for me, but he saw the Western Underwriting Company's indorsement was not on it, and he wouldn't take them until I got it. He telephoned up to Mr. Adams, and told him, 'Garrett brought these notes down here without the indorsement of the company.' Adams said, 'I will indorse them.' He was secretary of the company. I jumped in the machine and went up town and got the indorse-

ments on them and brought them down, and Mr. Edmonds gave me credit for both Mr. Taylor's and Mr. Mullen's notes.''

Hence Garrett, who made the contract with Taylor, by which Taylor was in fact deceived and misled into giving this note to the Western Underwriting Company, was the identical person from whom the bank claims to have received the note, who negotiated the note to the bank; and Garrett's evidence with Edmonds' evidence of the transaction will easily bear the inference that Garrett's authority as the Western Underwriting Company's agent extended to the right to negotiate notes taken by him for the sale of stock, and the transfer of the note by Garrett to the bank under the conditions shown was in fact, as it was in effect, the transfer of the note by the Western Underwriting Company, through its agent. Otherwise Mr. Edmonds, acting for the bank, would have required Garrett's indorsement and not the indorsement of the company. Edmonds testified that he knew a settlement would have to be made with the Underwriting Company by Garrett for the proceeds of the sale; and Garrett testified that he did settle the matter with the Underwriting Company after selling the note to the bank. Therefore the evidence does not bear out the apparent contention of the plaintiff that it took the note solely upon Garrett's claim of ownership of the note, but that it took the note upon the indorsement of the Western Underwriting Company, together with the knowledge it possessed of Garrett's right to deliver the note as its agent.

The note being payable to bearer, because it was made payable to the maker and indorsed by him in blank, and his indorsement in blank was the last indorsement (subdivision 5 of paragraph 4154, Civil Code 1913), and being in the possession of Garrett, without the bank's knowledge of the Western Underwriting Company's property in such note, it could safely have accepted Garrett's apparent title by such possession, and relied thereon. This the bank refused to accept and rely on, but required Garrett to get the indorsement of the Western Underwriting Company, before taking the note. Edmonds testified he did not know why Garrett's indorsement was not required. He had forgotten, perhaps, for the time being, that he relied only on the indorsement of the principal, and did not require the indorsement of the agent also.

The plaintiff failed to maintain the burden shifted to it by which it was required to prove that it or some person under whom it claims, viz., Garrett or Western Underwriting Company, acquired title in due course, as required by paragraph 4204 of the Civil Code of 1913. The evidence fairly shows, as we have seen, that the Western Underwriting Company did not acquire title in due course, and that Garrett's title was fairly shown to have been acquired with full knowledge of every fact connected with the transaction by which the Western Underwriting Company acquired its title, and further, that the evidence fairly shows that Garrett's title was that of agent of the Western Underwriting Company, and considered such agent by the plaintiff at the time it took the note.

The evidence amply sustains the implied finding that the note in suit in the hands of plaintiff was open to the defense of absence or failure of consideration. That defense was *prima facie* made out by evidence that defendant had received no stock of the Western Underwriting Company. This fact was virtually and, for the purposes of this cause, effectually admitted by plaintiff. Plaintiff, without pleading a tender of what it claims to be a sufficient performance, offered evidence tending to prove that 1,000 shares of Western Underwriting & Mortgage Company stock was issued to defendant on June 20, 1912, and placed with the note at plaintiff's bank. This was no performance of the agreement between the underwriting company and defendant made on June 3, 1912, out of which the note arose, because the Western Underwriting & Mortgage Company was not organized until June 11, 1912, and, according to Edmonds' testimony, the Western Underwriting Company was still in existence at the time of the trial, but the Underwriting & Mortgage Company had acquired all its assets. Certainly this is no reason why the old company did not receive fair value for its assets from the new company, and, if not, the management of the new company could not substitute its stock for the stock of the old company in performance of the old company's contract, unless the other adverse contracting party so agreed, and it is beyond dispute, so far as this record goes, that defendant did not so agree.

The evidence sustains the findings and the judgment, and the judgment for that reason is affirmed. Other questions

raised have been considered, but would in no manner change the result, if erroneous; therefore no good cause can be served by a discussion of such questions.

Judgment affirmed.

ROSS, C. J., and FRANKLIN, J., concur.

On rescission of stock subscription for fraud and misrepresentation, see note in 33 L. R. A. 721.